**DiNovoPrice**

DiNovo Price LLP
7000 N. MoPac Expressway
Suite 350
Austin, TX 78731

512.539.2626 (o)
512.539.2627 (f)
www.dinovoprice.com

Gabriel R. Gervey
ggervey@dinovoprice.com

November 30, 2018

Via Electronic Mail RAO_Chambers@cacd.uscourts.gov
The Honorable Rozella A. Oliver
Roybal Federal Building and United States Courthouse
255 E. Temple Street
Courtroom 590, 5th Floor
Los Angeles, CA 90012

      Re: *Infinity Computer Products Inc. v. Epson America Inc.* – Infinity's Informal Motion to Compel Production of Epson's Ink Sales Data

Dear Judge Oliver:

      Plaintiff Infinity Computer Products, Inc. ("Infinity") respectfully submits this brief in support of its motion to compel production of Defendant Epson's ink sales and related data (collectively, "ink sales data") in response to Infinity's Doc. Req. No. 58.[1] Epson's ink sales data is discoverable because it is (1) at least relevant to reasonable royalty damages; (2) proportional to the needs of the case; (3) responsive to plaintiff's request; and (4) non-privileged.[2] Epson argues that, under Rule 26's proportionality standard, the ink sales data are not discoverable because Infinity has identified only an attenuated and hypothetical relevance theory such that the purported high expense of production outweighs the benefit.[3] And, Epson contends that Plaintiff cannot articulate any theory of relevance under *Kirsch v. Canon USA, Inc.*,[4] and *Rite-Hite Corp. v. Kelley Co.*.[5] The burden to resist discovery lies with Epson, and Epson cannot not meet it for three reasons.[6] First, Epson has failed to produce any evidence of the costs, or even any specific description of costs, involved in producing the ink sales data to be weighed against the relevance of the information sought.[7] Second, Epson's ink sales are undeniably relevant to the reasonable royalty Epson owes for its infringement: (1) under *Georgia-Pacific* Factor No. 6, Epson's ink

---

[1] Ex. A, Plaintiff's October 24, 2018 Second Set of Requests for Production at 7. As a preliminary matter, while Req. No. 58 includes collateral sales in general, the only collateral sales at issue in this motion are Epson's sales of ink marketed or sold together with the Epson multifunction printers at issue in this case.

[2] Epson does not dispute responsiveness or privilege.

[3] Proportionality under the Federal Rules is governed by the well-known 6 factors listed in Federal Rule of Civil Procedure 26. *Polaris Innovations Ltd. v. Kingston Tech. Co., Inc.*, No. CV-16-00300-CJC-RAOx, 2017 WL 3275615, at *2 (C.D. Cal. Feb. 14, 2017) (factors not repeated here for brevity). Epson did not address any of these specific factors other than the burden of producing the requested information. These other factors, however, all favor production: (1) the importance of damages issues in this action, (2) the amount in controversy, which is millions of dollars, (3) Epson's exclusive control of the information at issue, (4) Epson's resources as a large corporation, and (5) Plaintiff's need to obtain this information through discovery. As Epson cannot dispute this without raising such arguments for the first time in its reply brief, the Court should grant Plaintiff's motion on these grounds. *Id.* at *6.

[4] No. 00-72775, 2009 WL 10696282, at *6 (E.D. Mich. Mar. 27, 2009)

[5] 56 F.3d 1538, 1549 (Fed. Cir. 1995)

[6] *Polaris Innovations Ltd.*, 2017 WL 3275615, at *2 (C.D. Cal. Feb. 14, 2017)

[7] *Id.* at *6. (noting failure to produce sworn testimony of burden in compelling production.)

sales are relevant to the appropriate *royalty rate* component of a reasonable royalty; and (2) a number of the claims require as a step of the claimed method "printing" such that the sales may be relevant to the appropriate *royalty base*, based on discovery and claim construction.[8] Indeed, ink cartridges are products Epson could reasonably expect to sell because of its infringement of the patented invention and its sales of its multi-function printers (MFP's) at issue, such that Epson's ink sales could at least support a higher royalty rate, if not also a higher royalty base. Third, *Hirsch* and *Rite-Hite* are distinguishable because: (a) these cases address only the *royalty base* component of a reasonable royalty and its relationship to the entire market value rule, and (b) unlike in *Kirsch*, where the ink and toner were not functionally part of the patented apparatus claims at issue, Claims 1 and 8 of Infinity's '574 Patent are method claims with steps involving printing, which necessarily consumes ink; thus, it is premature to exclude ink sales from the royalty base. Discovery is warranted; Infinity's requests are not overly broad; the need for the discovery outweighs the slight burden on Epson to gather and produce this information. Therefore, the Court should grant Infinity's motion and compel Epson to satisfy its discovery obligations by producing its ink sales data.

## I. BACKGROUND

On October 24, 2018, Infinity served Doc. Req. No. 58 on Epson, requesting the ink sales data. On November 21, 2018, Epson served its objections and responses.[9] Infinity repeatedly informed Epson of its theory for obtaining the ink sales data during related meet and confers. On November 9, 2018, Infinity informed Epson that (a) Infinity was relying on a royalty rate theory under G-P Factor No 6 for the ink sales' relevance; and (b) *Kirsch* provided no basis to withhold the documents and information requested. On November 13, 2018, Infinity provided Epson with citations to *Finjan, Inc. v. Blue Coat Sys., Inc.*,[10] and *Rite-Hite Corp. v. Kelley Co., Inc.*,[11] both of which support production of the ink sales data.[12] Epson stated that it would consider Infinity's position, but never responded further.[13] The parties' informal discovery conference with the Court followed.

## II. ARGUMENT

**A. The Ink Data Are Relevant to the Royalty Rate under *Georgia-Pacific* Factor No. 6.**

Epson asserts that Infinity lacks a concrete theory of relevance to overcome Epson's proportionality objection. Epson is wrong. Under *Georgia-Pacific* Factor No. 6, sales of collateral products are potentially relevant to both components of a reasonable royalty: the royalty base and the royalty rate.[14] Here, as a result of selling the multifunction printers (MFP's) at issue, Epson

---

[8] Plaintiff identifies these theories of relevance for the purposes of discoverability, but does not forgo the right to assert any other theory of relevance in any other context, including without limitation at summary judgment or trial.
[9] Ex. B, Defendant Epson's Responses and Objections to Plaintiff's Second Set of Requests for Production of Documents. Plaintiff also sought ink sales information in its May 24, 2018 Interrogatory No. 7. On August 20, 2018, Epson, relying on *Kirsch*, refused to produce any of the requested information.
[10] 2015 WL 4272870 (N.D. Cal. July 14, 2015).
[11] 56 F.3d 1538, 1549 n. 9 (Fed. Cir. 1995).
[12] Ex. C, Nov. 13, 2018 E-mail from N. Glauser to N. Boothe.
[13] Ex. D, Nov. 15, 2018 E-mail from N. Boothe to N. Glauser.
[14] *Georgia-Pacific* factor #6: The effect of selling the patented specialty in promoting sales of other products of the licensee; the existing value of the invention to the licensor as a generator of sales of its non-patented items; and the

has ink cartridges which are placed in and used in the Accused Products. Epson designed the Accused Products so that ink would be consumed when the Accused Products were operated. As a result, certain of Epson's ink sales are collateral products that Epson reasonably anticipated it would sell as a result of infringing Infinity's patents and selling its MFP devices at issue. Publicly available information shows that a significant portion of Epson's marketing program has been to sell certain MFP products at low prices with the intent to generate highly profitable ink sales over the average 5-year life span of the MFP products.[15] So collateral ink sales could increase the appropriate royalty rate.

Ample precedent recognizes this G-P Factor No. 6 theory of relevance. In *Deere & Co. v. Int'l Harvester Co.*, as part of the royalty rate analysis, the Federal Circuit approved the consideration of the effect of patented "corn head"[16] sales on the sales of the unpatented combine tractors to which they were sold attached (as or to which they could be attached):

> … the district court did nothing more or less than take into account the impact of anticipated collateral sales of an admittedly noninfringing product line on the respective bargaining positions of the parties engaged in the theorized licensing negotiations. We consider this an eminently reasonable approach to the willing seller-willing buyer analysis …[17]

Specifically, the *Deere* district court considered that defendant International Harvester would have lost up to 60 percent of its combine harvester sales without an appropriate corn head, including the infringing corn head, as well as that combine harvester sales were about three times as profitable as corn head sales.[18] Likewise, in *Finjan, Inc. v. Blue Coat Sys., Inc.*, citing the continued viability of *Deere*, the court determined that collateral sales of a software platform required to run infringing software could be considered as part of the royalty rate (but not royalty base) analysis.[19] Epson's suggestion that any non-infringing use of the collateral products destroys their relevance is incorrect. None of these cases even address alternative potential uses of the collaterally sold items. Accordingly, such alternative uses do not undermine the relevance of the

---

extent of such derivative or convoyed sales. In *Georgia-Pacific* itself, the district court found that sales of the patented specialty lumber products at issue likely increased sales of unpatented wood products, and this was relevant to the determination of a reasonable royalty rate. *Georgia-Pac. Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1131 (S.D.N.Y. 1970) ("This is a significant factor to be considered by the Court in determining the reasonable royalty because it has the logical tendency, as a matter of simple economics, to increase the amount of the reasonable royalty."). *See also, Kaneka Corp. v. Zhejiang Med. Co.*, No. CV 11-2389 SJO (SS), 2016 WL 11266869, at *13 (C.D. Cal. Oct. 18, 2016); *Finjan, Inc. v. Blue Coat Sys., Inc.*, No. 13-CV-03999-BLF, 2015 WL 4272870, at *10 (N.D. Cal. July 14, 2015)(finding collateral sales relevant to the royalty rate, but not royalty base analysis.)

[15] *See* Ex. E, Darby, L., Pociask, Stephen, "Inkjet Prices, Printing Costs and Consumer Welfare," accessible at http://www.theamericanconsumer.org/2007/11/inkjet-prices-printing-costs-and-consumer-welfare/ (last accessed Nov. 30, 2018.)

[16] "A 'corn head' is an apparatus commonly attached to a mobile crop-processing machine, or combine, for use in harvesting corn." *Deere & Co. v. Int'l Harvester Co.*, 710 F.2d 1551, 1553 (Fed. Cir. 1983).

[17] 710 F.2d 1551 at 1559 (Fed. Cir. 1983). Notably, combine harvesters by their nature can be used for other purposes, such as harvesting grain. https://en.wikipedia.org/wiki/Combine_harvester.

[18] *Deere & Co. v. Int'l Harvester Co.*, No. RI-CIV-76-0020, 1982 WL 63786, at *3 (C.D. Ill. Oct. 8, 1982), *aff'd in part, rev'd in part*, 710 F.2d 1551 (Fed. Cir. 1983). Epson's ink sales data would enable Plaintiff to perform a similar analysis.

[19] 2015 WL 4272870 at *10.

collateral sales to the royalty rate in any of these cases.[20] The Court should compel Epson to produce the ink sales data.

### B.  *Kirsch* and *Rite-Hite* are Distinguishable

Epson asserts that *Kirsch* and *Rite-Hite* bar discovery of the ink sales data as part of a reasonable royalty analysis. Neither case does so. In *Kirsch*, the court found at summary judgment that, under the facts of that case, plaintiff's expert could not include ink sales in plaintiff's royalty **base** analysis because it could not satisfy the entire market value rule.[21] *Kirsch* never addresses whether ink sales can be considered as part of royalty **rate** analysis or the discoverability of collateral sales data on that basis. And, unlike in *Kirsch*, where Plaintiff's patented apparatus did not include any use of ink or toner, Infinity's claims require ink consumption to perform the steps of certain accused methods.  *See, e.g.*, U.S. Patent No. 8,040, 574 ("the '574 Patent"),  claim 1 ("in the first mode, storing the digital scan data in a computer readable medium, for use as needed, and in the second mode, printing the digital image print data using a fac-simile machine printer device.").

Moreover, Epson's reliance on *Rite-Hite*, on which *Kirsch* also relies, is misplaced because that decision actually supports Infinity's position, not Epson's position. In *Rite-Hite*, the Federal Circuit considered the role of the entire market value rule in determining the royalty base. [22] The Federal Circuit, however, explicitly stated that its analysis was not applicable to the royalty rate: "[t]his issue of royalty base is not to be confused with the relevance of anticipated collateral sales to the determination of a reasonable royalty rate."[23] *Rite-Hite* cites to *Deere* as supporting the relevance of collateral sales to the royalty rate determination.[24] Thus, contrary to Epson's assertions, *Rite-Hite* is not only distinguishable, it supports discovery of Epson's ink sales data.

For the above reasons, the Court should compel Epson's production of the ink sales data.

Sincerely,

*/s/ Gabriel R. Gervey*
Gabriel R. Gervey

cc: Counsel of Record (via Email)

---

[20] Plaintiff does not concede or forgo the possibility that the ink sales data may be relevant to the royalty base, as well. As noted above, Asserted Claims 1 and 8 of the '574 Patent including a printing step, and printing on Epson MFP device necessarily requires ink. Accordingly, Epson's ink sales may be relevant to a royalty base analysis. Epson's proportionality argument should not serve as a premature and stealth summary judgment motion regarding the permissible scope of Plaintiff's reasonable royalty theories, as Plaintiff's infringement and damages theories are still under development during the discovery period.  Because Plaintiff has set forth a concrete theory of relevance related to the royalty rate that merits production of the ink sales data, the Court need not determine that Plaintiff cannot meet later its burden under *Rite-Hite (*or effectively satisfy or distinguish *Kirsch*) as related to appropriate royalty base. Infinity respectfully requests that the Court refrain from reaching this question.
[21] 2009 WL 10696282, at *6 (E.D. Mich. Mar. 27, 2009).
[22] *Id.*
[23] 56 F.3d 1538, 1549 n. 9 (Fed. Cir. 1995).
[24] *Id.*